**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 37912**

| | | |
|---|---|---|
| IN THE MATTER OF JANE DOE, JANE DOE I, AND JOHN DOE, CHILDREN UNDER 18 YEARS OF AGE. | ) ) ) ) | 2010 Unpublished Opinion No. 744A |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) ) | Filed: December 17, 2010 |
| Plaintiff-Respondent, | ) ) ) | Stephen W. Kenyon, Clerk |
| and | ) ) | AMENDED OPINION THE COURT'S PRIOR OPINION DATED DECEMBER 15, 2010 IS HEREBY AMENDED |
| GUARDIAN AD LITEM, | ) ) ) | |
| Respondent, | ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| v. | ) ) | |
| JANE (2010-19) DOE II, | ) ) | |
| Defendant-Appellant, | ) ) ) | |
| and | ) ) | |
| JOHN DOE II, | ) ) | |
| Defendant. | ) ) | |

Appeal from the Magistrate Division of the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Hon. Roger Harris, Magistrate.

Order terminating parental rights, affirmed.

Marilyn B. Paul, Chief Public Defender, Twin Falls County; Samuel S. Beus, Deputy Public Defender, Twin Falls, for appellant. Samuel S. Beus argued.

Hon. Lawrence G. Wasden, Attorney General; James T. Baird, Deputy Attorney General, Boise, for respondent, Idaho Department of Health & Welfare. James T. Baird argued.

Jamie LaMure, Kimberly, for respondent, guardian ad litem. Jamie LaMure argued.

---

1

GRATTON, Judge

Jane Doe II (Doe) appeals from the magistrate's order terminating her parental rights as to her three children, A.Y., A.K., and W.K. Specifically, Doe contends that the magistrate erred in finding that Doe neglected her children as defined in Idaho Code § 16-2002(3)(a) and (b). Doe also argues that the statutory scheme set forth in I.C. § 16-2002(3)(b) is unconstitutional. We affirm.

## I.

### FACTS AND PROCEDURAL BACKGROUND

Doe is the mother of three children, A.Y., a female born in June 2004; A.K., a female born in May 2006; and W.K., a male born in May 2007.[1] In July 2007, the Department of Health and Welfare received a referral regarding allegations of physical abuse of A.K. by her father, T.K. The informant reported that A.K. had bruising on her face and legs, which the Department later verified. The Department and Doe developed a safety plan to address concerns of domestic violence, use of profanity, and appropriate parenting in the home. T.K. signed the safety plan. Then, in August 2007, the Department received another referral regarding allegations of physical abuse of W.K. by T.K. Doe testified at the termination hearing that before the incident with W.K. occurred she had planned to leave T.K. and move into a shelter with the children, and that she called the Department after the incident to report the abuse.

Nancy Espinoza, a child welfare supervisor with the Department, testified that Doe agreed to voluntarily work with the Department to reduce safety issues with T.K. and keep the children from him. Espinoza testified, however, that once Doe went to the shelter, the Department was made aware that there was also a safety issue with Doe being able to meet the children's needs without the intervention of other adults. The Department wanted to continue with a voluntary case plan, so Doe moved in with relatives to avoid having the children placed in foster care.

---

[1] The father of A.Y. has never been involved in her life. He could not be located by the Department, but received notice by publication regarding the termination proceedings. The magistrate terminated his parental rights, and he has not appealed. T.K. is the father of A.K. and W.K. His attorney represented at the termination hearing that T.K. had desired termination from the beginning of the child protection case, but that the Department objected unless Doe's parental rights were terminated as well. T.K. does not appeal from the magistrate's order terminating his parental rights to A.K. and W.K.

2

Doe testified that when she was young her aunt, Bernice Tucker, removed her from her mother because her mother was a drug addict. Doe refers to Tucker as her mother and to Tucker's daughter, Joyce McCall, as her sister. While working on the voluntary case plan Doe lived, at separate times, with McCall, as well as McCall's sister-in-law. In November 2007, Doe's family members called the Department based upon a concern that Doe had resumed her relationship with T.K. Doe was confronted with this allegation and informed that in order to avoid having her children placed in foster care, she was to sign temporary guardianship over to McCall and begin working on a case plan in order to establish herself and care for her children. Thereafter, McCall sought custody of all the children, but later removed A.Y. and W.K. from the lawsuit, retaining only A.K. as part of the case. McCall testified that she was ultimately granted, by court order, visitation with A.K. every other weekend. McCall testified that she had cared for A.K. for the majority of her life, until the time when she was placed in foster care.

Based upon the family members' concerns regarding Doe's ability to parent the children, including their claims that Doe was frequenting a club and allowing unknown individuals to watch the children, that Doe had resumed contact with T.K., engaged in relationships with individuals on whom she had little background, and that Doe had left the children without checking-in with family members, a family group meeting was held on May 16, 2008, to facilitate an intervention with Doe. Doe was given two options: (1) she could voluntarily place the children with a family member and assist in providing care and supervision for the children; or (2) she could choose to have the children removed from her care and placed in foster care. Doe testified that she initially opted to have the children placed in foster care because she did not believe any of her family members were good candidates for having children, but ultimately decided to have the children placed with a family member so she could be close to them. Shortly thereafter, however, Doe's family members notified the Department that they were unable to motivate Doe into making suitable parenting choices and felt that the court should become involved.

The Department initiated a child protection action and obtained temporary custody of the children on May 23, 2008. A shelter care hearing was held on May 27, 2008, and the magistrate ordered that the children remain in the custody of the Department pending an adjudicatory hearing, based upon the finding that there was an unstable home environment. The Department filed a report of investigation on May 29, 2008, setting forth the factual basis for jurisdiction as Doe's inability to maintain a home of her own or to remain at any residence of family members.

3

The Department also outlined a number of "required corrective measures" requiring Doe to participate in a psychological evaluation to evaluate her ability to parent by herself, provide verification of housing, provide random drug testing, work with a client service technician from the Department for supervised visitation with the children, and agree to attend and participate in parenting classes provided through the community. The report concluded that Doe "needs to demonstrate motivation and parenting skills if reunification is to occur."

Following the adjudicatory hearing, the magistrate entered its order on June 11, 2008, vesting legal custody of the children in the Department. The magistrate noted that the Department had made reasonable efforts, specifically, working with Doe on a voluntary basis and providing services to prevent the children's removal from the home, but that those efforts were not successful. The magistrate ordered that the Department prepare a case plan, including a reunification plan and an alternative permanency plan. On June 30, 2008, the magistrate approved the case plan, making two additions: (1) when the children return to the mother's home, the IDHW must conduct at least one home visit per week; and (2) the case plan modified to address concerns regarding the father, T.K. The case plan identified areas of concern in restoring the children to Doe's custody, as well as a desired result for each concern. In order to accomplish the desired results for each area of concern, Doe was required to complete specific tasks.

The Department filed a number of progress reports, and review hearings were held on September 18, 2008; December 11, 2008; and March 5, 2009, each resulting in continued custody with the Department. On May 19, 2009, the Department filed a permanency report, recommending termination of Doe's parental rights and adoption as the permanency plan. On June 16, 2009, the Department filed a motion and petition seeking to terminate Doe's parental rights in the children. Following a permanency hearing, the magistrate entered an order approving the permanency plan on June 18, 2009, with termination of parental rights and adoption being the goal.

On May 3 and 4, 2010, after a number of continuances, a trial was held on the State's motion to terminate Doe's parental rights. The parties submitted briefing to the magistrate on their respective arguments and proposed findings of fact. On July 2, 2010, the magistrate issued a memorandum decision concluding that Doe had neglected the children and that termination of the parent-child relationship would be in the children's best interests. Thereafter, on July 12,

4

2010, the magistrate entered findings of fact, conclusions of law, and a decree terminating Doe's parental rights to the children. Doe appeals.

## II.

## ANALYSIS

In an action to terminate parental rights, due process requires this Court to determine if the magistrate's decision was supported by substantial and competent evidence. *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006). Substantial and competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. at 345-46, 144 P.3d at 599-600. This Court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Doe v. Doe*, 148 Idaho 243, 246-47, 220 P.3d 1062, 1064-65 (2009). We conduct an independent review of the record that was before the magistrate. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002); *see also Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). "Implicit in [the Termination of Parent and Child Relationship Act] is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001(2). Therefore, the requisites of due process must be met when the Department intervenes to terminate the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the Department prove grounds for terminating a parent-child relationship by clear and convincing evidence. *Id*. Idaho Code § 16-2005 permits the Department to petition the court for termination of the parent-child relationship when it is in the child's best interest and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period which will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

## A.     Neglect

In this case, the magistrate terminated Doe's parental rights on the ground of neglect, I.C. § 16-2005(1)(b). Idaho Code § 16-2002(3) defines "neglect" as any conduct included in I.C.

§ 16-1602(25), as well as situations where the "parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9)." I.C. § 16-2002(3)(b). The time standard established by I.C. § 16-1629(9) is defined as when "a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care." The magistrate found that Doe had neglected her children pursuant to I.C. § 16-2002(3)(a) because her conduct fell within the definition set forth in I.C. § 16-1602(25). The magistrate also found that under I.C. § 16-2002(3)(b), Doe had neglected her children because she had failed to comply with the case plan and reunification had not occurred within the time limit imposed by I.C. § 16-1629(9). Because we find the first ground of neglect dispositive, I.C. § 16-1602(25), we need not address Doe's contention with respect to the case plan.[2]

### 1. Parental responsibilities

Idaho Code § 16-1602(25)[3] provides that "neglected" means a child:

(a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them; however, no child whose parent or guardian chooses for such child treatment by prayers through spiritual means alone in lieu of medical treatment shall be deemed for that reason alone to be neglected or lack parental care necessary for his health and well-being, but this subsection shall not prevent the court from acting pursuant to section 16-1627, Idaho Code; or

(b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being; or

(c) Who has been placed for care or adoption in violation of law.

The magistrate noted that while the evidence was clear and convincing that Doe loves her children, it was equally clear that despite her best efforts, she had failed to correct the issues that brought the children into foster care. The magistrate also acknowledged that several witnesses

---

[2] Moreover, because we affirm the magistrate on grounds unrelated to the case plan, we need not address Doe's argument that I.C. § 16-2002(3)(b) is unconstitutional.

[3] When the petition to terminate Doe's parental rights was filed, this subsection read as stated. It has since been amended to include the lack of a proper education due to the failure to comply with I.C. § 33-202 as a definition for "neglected." *See* 2009 Idaho Sess. Laws, ch. 103, § 1, p.316.

had testified that while Doe was successful on certain aspects of the case plan, she was unable to demonstrate the skills needed to properly take care of her children and provide them with a safe, stable, and loving home environment. The court found that specific instances of Doe's lack of internalization included her outbursts of anger during visits, her inability to safely care for more than one child at a time without becoming frustrated, her ongoing association with men who utilize controlled substances, and her own acknowledgement that she might need help parenting the children. The court determined:

> As a result of these failures and [Doe's] inabilities, the court concludes that if it returned the children back to [Doe] at this point, and/or gave her additional time to continue to complete her case plan so that she could gain the skills needed to properly parent the children, the additional time would be fruitless. The evidence presented at trial convinces the court that [Doe] does not have the capacity to develop the skills needed to properly care for her children, and that the children would be right back in foster care within a short period of time.

The magistrate's findings are supported by substantial and competent evidence in the record.

Doctor Lucas Bossard, a licensed psychologist, testified that he met with Doe to evaluate whether she had the cognitive ability to parent the children. He testified that while he could not completely assess her parenting abilities due to the fact that he was unable to observe her in a home environment, he believed that Doe would need services and assistance in order to parent effectively because of her "lack of insight with regard to parenting." He also testified that he conducted a personality inventory, which indicated that Doe was defensive, that she would be resistant to treatment, and that she exhibited instability in her personal relationships.

Dawna Flora, Doe's case worker, testified that when Doe initially began the voluntary case plan, she was provided with many services, including in-home services to assist her with parenting skills. In spite of all of the services and parenting classes, Doe was unable to demonstrate an ability to parent her children appropriately. Espinoza, Flora's supervisor, also testified that Doe was unable to apply any of the parenting skills she had been taught. She testified that whenever Department employees made suggestions about parenting, she would get very defensive. She stated that the Department was still addressing the same concern that brought the children into foster care to begin with, Doe's inability to provide her children with "consistent, ongoing structured parenting."

Each of the Department employees testified that Doe's visits with the children were chaotic. They testified that Doe was unable to maintain control and demonstrate that she could

7

parent all three children at the same time. Carlos Ramos, a client services technician, generally supervised the visits and took notes of what occurred. Ramos testified that the visits were chaotic, that the kids were loud and obnoxious, and that they would run all over the room and climb on the furniture. He testified that he did not see "someone there in control of the kids." Ramos testified that Doe had trouble setting rules and following through with consequences, and that she had placed her children in danger a number of times. Ramos testified that W.K. would often run into the parking lot and, on one occasion, he ran out of a restaurant parking lot towards the street and was almost hit by a bus.

Ramos did acknowledge that a number of visits were appropriate, but that Doe had spanked the children, raised her voice to them, and used "extra force" when telling the children to sit down. Ramos also testified that he would give Doe parenting advice, but that she was unable to follow through with any of his suggestions. Doe admitted that while she learned different skills in her parenting classes, she did not use those skills during her visits with the children. Her explanation for disregarding various parenting techniques was that they did not work if she did not have her children "full time." Doe also acknowledged that she "may need a lot of help" if her children were returned to her.

The magistrate also found that "[s]tability and . . . having the means to provide a safe and stable home should have been recognized as priorities for [Doe]." The court noted that Doe's only source of income consisted of SSI payments for her learning disabilities. The magistrate found that Doe was capable of obtaining employment, but that she chose not to, despite knowing that the extra money might help her gain the stability and housing needed to reunite with her children. The court acknowledged Doe's plan to qualify for more government benefits, including a bigger apartment, if the children were returned to her. However, the court concluded that Doe was aware of the importance of maintaining a safe and stable home, and that her lack of ability to do so convinced the court that she had not gained the stability in her life, nor the skills, to reunite with the children and provide them with a safe and stable home environment.

Both Flora and Espinoza testified that Doe had failed to obtain stable housing. Flora testified that she did approve one location, a five-bedroom house. However, shortly after performing the inspection, Doe, and her boyfriend at the time, were evicted. While Doe was living in that house, the police were also called about a domestic dispute between Doe and her boyfriend where Doe had stabbed a couch with a knife. Flora also testified that Doe self-disclosed having several relationships with men who tend to use drugs. Doctor Bossard testified

8

that, based upon Doe's self-reported history, he was concerned about her tendency to enter into relationships with men without consideration of the negative consequences associated with that. Flora testified that Doe is also very dependent on other individuals and that she turns to others to provide financially for herself and for the children.

Doe contends that the magistrate's findings disregarded the fact that Doe and the children initially became involved with the Department because they were victims of domestic violence. Doe argues that while she admitted to her social worker that she had associated with men who had used drugs, there was no evidence presented that she had any problems with drugs or alcohol. Doe further claims that aside from a few isolated instances, there is nothing in the record to indicate that Doe inflicted anything upon her children beyond the normal frustrations of a parent dealing with small children.

The magistrate did not disregard the fact that allegations of physical abuse initiated the Department's involvement with Doe and her children. In fact, the court specifically considered those events, as well as Doe's inability to protect and parent her children, in making its determination with respect to whether the children had been neglected. With respect to Doe's contention that she has never used alcohol or drugs, that was not one of the Department's primary concerns. Rather, the Department was concerned that Doe was spending time with individuals who used drugs and alcohol and had exposed, and would continue to expose, the children to these individuals. While the court did highlight certain instances relative to Doe's actions or inactions, it did not do so to the exclusion of everything else. Moreover, the evidence demonstrates that Doe's behavior towards her children did not consist of only a few isolated instances. The court appropriately considered all of the circumstances in concluding that despite having received assistance for two years, Doe's parenting skills did not appear to be any better than they were when the children entered foster care.

We acknowledge that Doe did make efforts to comply with her case plan and reunify with her children. However, Doe's failure to apply the parenting skills she was taught and demonstrate increased parental competence, her inability to recognize the harmful effects of certain individuals on herself and her children, her reliance on others to provide financially for herself and her children, and her failure to obtain safe and stable housing, all demonstrate that she is unable to discharge her responsibilities such that if the children were returned to her care they would lack the parental care necessary for their health, safety, and well-being. While the evidence is conflicting, there is substantial and competent evidence in the record to support the

magistrate's determination that the children were neglected as defined by I.C. § 16-1602(25). *See Department of Health & Welfare v. Doe*, 147 Idaho 353, 356, 209 P.3d 650, 653 (2009) (concluding that while the case was not as "clear-cut" as most parental termination cases, there was substantial, competent evidence in the record to support terminating parental rights where the parents had failed to comply with the magistrate's orders to complete their case plan and had failed to appropriately discharge their parental responsibilities).

**B. Best Interests**

In concluding that termination was in the best interests of the children, the magistrate considered the social worker's opinions, Doe's inability to properly parent the children, and the conflicting policies of the parents' fundamental liberty interest in maintaining a relationship with their children versus the need to provide permanency in a child's life. Doe has not challenged the magistrate's determination on appeal, and while we need not address it, we have reviewed the record and conclude that there is substantial and competent evidence supporting that determination.

**III.**

**CONCLUSION**

There was substantial and competent evidence to support the magistrate's decision to terminate Doe's parental rights. The magistrate's order terminating Doe's parental rights to A.Y., A.K., and W.K. is, therefore, affirmed. No costs or attorney fees are awarded on appeal.

Chief Judge LANSING and Judge GUTIERREZ, **CONCUR.**